**UNITED STATES of America, et al., Plaintiffs,**

**v.**

**State of WASHINGTON, et al., Defendants.**

**No. 9213 Phase I.**

United States District Court, W.D. Washington.

COMPILATION OF MAJOR POST-TRIAL SUBSTANTIVE ORDERS (January 1, 1985 through December 31, 1986)

Colleen Kelley, United States Department of the Interior, Portland, OR, Kerry Jane Keefe, U.S. Attorney's Office, Jane Garrett Steadman, Phillip Evan Katzen, Kanji & Katzen, Eric J. Nielsen, Nielsen Broman & Koch, Seattle, WA, Vanessa Boyd Willard, U.S. Department of Justice, Denver, CO, Riyaz Amir Kanji, Kanji & Katzen, Ann Arbor, MI, James Rittenhouse Bellis, Suquamish Tribe, Suquamish, WA, Fawn R. Sharp, Tribal Attorney, Taholah, WA, Katherine K. Krueger, Quileute Natural Resources, La Push, WA, Lori Ellen Nies, Raymond G. Dodge, Jr., Tribal Attorney, Skokomish Nation, WA, Emily Rae Hutchinson Haley, James Miller Jannetta Swinomish Indian Tribal Community, La Conner, WA, Thomas A. Zeilman, Law Office of Thomas A. Zeilman, Yakima, WA, for Plaintiffs.

Department of State, U.S., pro se.

Rene David Tomisser, Bryce E. Brown, Jr., Joseph V. Panesko, Michael S. Grossmann, Joseph Earl Shorin, III, Attorney General's Office, Laura J. Watson, Noah Guzzo Purcell, Philip Michael Ferester, Terence A. Pruit, Olympia, WA, for Defendants.

## TABLE OF CONTENTS

ORDER                                                                    PAGE

Order Adopting Puget Sound Salmon Management Plan (10/17/85)              1083

Order Re Hood Canal Management Plan (7/3/86)                             1103

COMPILATION OF MAJOR POST-TRIAL SUBSTANTIVE ORDERS
(Through December 31, 1986)

ORDER ADOPTING PUGET SOUND SALMON MANAGEMENT PLAN

(sub no. 85–2)

(October 17, 1985)

WALTER E. CRAIG, District Judge.

On August 31, 1977, this court approved a Puget Sound Salmon Management Plan that had been jointly developed by the affected parties. 459 F.Supp. 1020, 1107 (W.D.Wash.1978), subsequently modified October 11, 1978. The plan was to be periodically reviewed by the parties, and commencing in May, 1982, the parties or any of them could propose modifications to the court. On June 1, 1982, the court granted a motion continuing the plan until further order of the court so as to give the parties more time to develop a replacement plan.

The Puget Sound Tribes and the Washington Department of Fisheries have reached agreement on a new plan for managing the Puget Sound salmon runs. The new plan is based upon the experience the parties have had in managing Puget Sound Fisheries, since the 1977 plan was enacted. The new plan includes provisions for continued annual review and possible modifications as well as provisions for the development of more detailed regional plans by agreement of the affected parties.

The State of Washington, the Puget Sound Area tribes and the United States have asked this court to approve the new plan and incorporate its provisions as an order of the court.

The court has received and reviewed the proposed new plan. After a review of the plan, the court has amended paragraph 11.1.4 at page 29 by adding the following sentence:

"However, nothing herein is to be construed as relieving any party of any obligation under any law or any administrative or judicial order to timely furnish any information or data to any state, federal, or international governmental body or officer."

The court adopts the attached May 15, 1985 Puget Sound Salmon Management Plan, as amended by the court, as an order of this court to replace the Memorandum Adopting Salmon Management Plan, as modified and set out at 459 F.Supp. at 1107–1113. The parties are directed to implement the plan consistent with the Pacific Salmon Treaty and its implementing legislation (P.L. 99–5) and the Salmon and Steelhead Conservation and Enactment Act, 16 U.S.C. 3301 *et seq.* Other previous orders of this court are changed only to the extent they are explicitly modified by the terms of the attached Plan and then only with respect to their application to runs covered by this Plan.

PUGET SOUND SALMON
MANAGEMENT
PLAN

1084

## TABLE OF CONTENTS

| | | Page |
|---|---|---|
| 1 | PREAMBLE | 1084 |
| 2 | DEFINITIONS | 1086 |
| 3 | ESCAPEMENT | 1088 |
| 4 | EQUILIBRIUM BROOD PROGRAM | 1089 |
| 5 | TECHNICAL AND MANAGEMENT REPORTS AND DOCUMENTS | 1090 |
| 6 | SCHEDULES | 1093 |
| 7 | MANAGEMENT PERIODS | 1094 |
| 8 | TEST AND EVALUATION FISHERIES | 1094 |
| 9 | HARVEST RATES | 1095 |
| 10 | ALLOCATION OF HARVEST | 1095 |
| 11 | COORDINATED INFORMATION SYSTEMS | 1096 |
| 12 | TIMING AND CONTENT OF FISHING REGULATIONS | 1098 |
| 13 | REGIONAL MANAGEMENT PLANS | 1099 |
| 14 | DISPUTE RESOLUTION | 1099 |

### 1.0  PREAMBLE

1.1  The purpose of this plan is to establish guidelines for management of salmonid resources originating in or passing through Washington waters from the mouth of the Strait of Juan de Fuca eastward (Puget Sound) only. The parties hereto, all Puget Sound treaty tribes and the Washington Department of Fisheries, shall manage from the premise that steel head and salmon fisheries are intimately related, although it is recognized that the Washington Department of Fisheries does not have jurisdiction over steel head fisheries. The parties agree to a philosophy of cooperation in implementing management programs to maintain, perpetuate and enhance the salmonid resources.

1.2  This plan is intended to ensure that treaty fishermen and non-treaty fishermen, subject to their respective regulatory authorities, shall be afforded the opportunities to harvest their shares as determined in *United States v. Washington,* 384 F.Supp. 312 (W.D.Wash.1974), *aff'd* 520 F.2d 676 (9th Cir.1975), *cert. denied* 423 U.S. 1086, 96 S.Ct. 877, 47 L.Ed.2d 97 (1976), *aff'd sub nom. Washington v. Washington State Commercial Passenger Fishing Vessel Association,* 443 U.S. 658, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979) and other orders under the court's continuing jurisdiction.

1.2.1  The parties have developed this plan with the objectives of promoting the stability and vitality of the treaty and non-treaty fisheries of Puget Sound and of steadily improving the practical and technical basis for management of each of the Puget Sound fisheries.

1.3  The parties agree to enact and recommend for enactment by the Pacific Fishery Management Council, appropriate regulations for the ocean salmon fishery that will provide for adequate escapement of salmon into Puget Sound waters to achieve the goals and purposes of this plan.

1.4  The parties shall advocate and recommend to the appropriate

governmental and regulatory entities, international agreements to reduce foreign interceptions of salmonids originating from Puget Sound.

1.5 This plan shall remain in effect from the date of the order approving it until modified by agreement of the parties or order of the court.

In order to implement changes for the following year, modifications to this plan must be proposed in writing to other parties by October 1 and either be agreed to by a signed stipulation of all parties filed with the court by December 31 or be entered as an order of the court by December 31. Unless both the October 1st and December 31st deadlines are met, this plan shall continue in effect for the following year. Disputes regarding modifications of the plan must go through the Dispute Resolution process before being filed with the court.

1.6 Where action of the parties is required in this plan, failure to act or to reach agreement shall be resolved as provided in Section 14.

1.7 When adopted by the Court, this plan supercedes and replaces the Memorandum Adopting Salmon Management Plan, 459 F.Supp. at 1107, as extended by the Order of June 1, 1982 (Docket Number 8421); it also supplements, and where inconsistent, modifies the Order on Certain Questions Re Salmon Fisheries Management, dated April 13, 1976, 459 F.Supp. at 1069, which is hereby extended and shall remain in effect until further order of the Court, provided, that nothing in this plan is intended to modify or supercede the answer to Question No. 2 as set forth in that Order. This plan also supplements and where inconsistent modifies the Order for Program to Implement Interim Plan, 459 F.Supp. at 1035, the Orders Establishing Fisheries Advisory Board and Prescribing Procedures for State Emergency Regulations, 459 F.Supp. at 1061, and Order Re Notification and Effective Date of Emergency Regulations dated August 29, 1980, Docket Number 7158. All orders not expressly modified remain in effect.

1.8 The parties agree that the permit processes of the parties will remain intact. For any project or activity which has been agreed upon by the parties, the issuance of a Washington Department of Fisheries permit will be automatic. Disputes which might arise over issuance of a permit will be submitted to the dispute resolution process described in Section 14.

1.9 All fisheries, both recreational and commercial, are covered by the provisions of this, plan unless specifically indicated otherwise. It is the Intent of the parties that recreational fisheries be managed consistent with the standards and principles set forth in this plan, and particularly that the recreational fishing regulations adopted by the Washington Department of Fisheries shall be made in accordance with the escapement and allocation provisions of this plan. However, it is recognized by the parties that because of the na-

ture of recreational fisheries, they cannot always be adjusted in mixed-stock marine management areas as readily in season or in the same time frame as commercial fisheries. Recreational fisheries generally rely on published annual regulations with few in-season adjustments, particularly in marine waters. Resolution of pre-season Puget Sound recreational marine and freshwater management conflicts and agreement on annual recreational fishing plans and objectives must be reached according to the schedules as outlined in Section 6, with consideration for maintaining stability.

## 2.0 DEFINITIONS

Except where the context clearly requires otherwise, the following terms used in this plan have the following meanings:

### Adult Fish

A mature salmonid returning to spawn.

### Affected Party

A party whose fisheries will be affected by a proposed action under this plan.

### Allocation Equivalent

The standard unit of measure used to determine the number of adult fish that would return to treaty fishing areas in the absence of non-treaty fishing. The allocation equivalent run size shall be the net result of accounting for natural mortalities, transfer of harvest to foreign fisheries, and direct fishery-related wastages which are not reflected in actual landings.

### Allocation Unit

A management unit or group of management units with similar timing for which harvest scares are calculated.

### Equilibrium Brood Program

The standard mode of operation for existing facilities/functions, associated with intervention in one or more of a salmon's life history stages.

### Escapement

That portion of a run that is not harvested and escapes to natural or artificial spawning areas.

### Evaluation Fishery

A commercial fishery conducted for the purpose of acquiring technical or management Information.

### Future Brood Planning Report

The annual expression of the equilibrium brood program as it pertains to the coming year's run of salmon.

### Management Period

The time interval during which regulatory actions are taken to meet the escapement requirements for a management unit or allocation requirement for an allocation unit, taking into account catches (actual or expected) of the unit(s) made outside its management period. Management periods are specific to each management unit (or aggregate of units) and to each fishing area through which the unit(s) passes.

### Management Unit

A stock or group of stocks which are aggregated for the purpose of achieving a desired spawning escapement objective.

### Maximum Sustained Harvest (MSH)

The maximum number of fish of a management unit that can be harvested on a sustained basis, measured as the number of fish that would enter fresh water to spawn in the absence of fishing after accounting for natural

mortality. MSH is intended to mean maximum sustained harvest to Washington fisheries.

MSH Escapement

The specific escapement for a management unit necessary to provide MSH under average environmental conditions.

Natural Spawning Area

An area which is or may be utilized by spawning salmon and in which egg deposition and fertilization occur naturally.

Parties

The state and the 17 Puget Sound tribes together make up the parties to this plan.

Primary Management Unit

A stock or group of stocks for which a specific spawning escapement goal is established with the intention of managing all impacting fisheries to meet that goal.

Prior Interceptions

Harvest of a run by fisheries outside of its region of origin or immature fish within their region of origin computed separately for treaty and non-treaty fishermen.

Region of Origin

A geographic area from which an allocation unit originates. The following geographic areas are recognized regions of origin:

(1) Strait of Juan de Fuca (tributaries)

(2) Bellingham/Samish Bays—Nooksack—Samish Rivers

(3) Skagit

(4) Stillaguamish–Snohomish

(5) South Puget Sound, south of Snohomish System

(6) Hood Canal

(7) Canada

Run

A stock or group of stocks identified for fishery management purposes.

Run Size

The number of fish in an allocation unit, management unit, stock or any aggregation thereof.

Salmonid

The following anadromous species of the family Salmonidae which are native to the United States v. Washington Case Area:

Oncorhynchus tshawytscha (chinook, king, spring, tyee, blackmouth salmon)

Oncorhynchus kisutch (coho, silver, silverside, hooknose salmon)

Oncorhynchus nerka (sockeye, red, blueback salmon)

Oncorhynchus keta (chum, dog, keta salmon)

Oncorhynchus gorbuscha (pink, humpback, humpy salmon)

Salmo gairdneri (Steelhead)

Secondary Management Unit

A stock or group of stocks for which escapement is that which occurs primarily as a result of not being caught in fisheries directed at commingled primary units.

State

Washington Department of Fisheries (WDF)

Stock

An anadromous salmonid population of a single species migrating during a particular season to a specific fish production facility and/or to a freshwater system which flows into saltwater.

Test Fishery

An agreed-upon fishery conducted on a limited basis for the purpose of acquiring technical or management information. Any fish taken in test

fisheries may not be sold for personal profit.

Tribes

All Puget Sound treaty tribes: Lummi, Nooksack, Suquamish, Swinomish, Upper Skagit, Sauk–Suiattle, Tulalip, Stillaguamish, Muckleshoot, Puyallup, Nisqually, Squaxin Island, Skokomish, Port Samble Klallam, Jamestown Klallam, Lower Elwha Klallam, and Makah.

## 3.0 ESCAPEMENT

3.1 Decisions made by the parties concerning stock enhancement, habitat protection, and harvest management programs and policies recognize that the escapement of natural and hatchery management units must be preserved and protected sufficiently to ensure their perpetual existence and maximize the benefits derived from their protection. In order to provide a desired level of future harvest, it is necessary to prevent the capture of a certain portion of the run, so that these uncaught fish can spawn and produce fish for future use. An escapement goal must be evaluated primarily according to whether it achieves these purposes.

3.2 The parties shall determine and agree as to primary and secondary management unit status. In making this determination, at least the following factors should be taken into account: (a) harvest management conflicts between harvest rates appropriate to harvest fish returning to hatcheries and fish returning to natural spawning areas simultaneously; (b) the management history pertinent to the stocks; (c) the present or future production potential of the stocks; (d) unique characteristics of the stock with respect to behavior, physiology, or morphology which might be desired for future stock enhancement; (e) the technical feasibility of achieving escapement allowances in the short and/or long term; (f) legal obligations of the parties; (g) substantial intra- and inter-specific conflicts; and (h) impacts on existing fisheries of attempting to reach MSH escapement level according to a set time schedule. The primary or secondary status of a unit may be changed only by agreement of the parties.

3.3 Escapement goals for fish returning to hatcheries and natural spawning areas shall be agreed upon on a management unit basis. The parties shall reach agreement as to what comprises each management unit.

3.4 For primary management units returning to hatcheries, escapement goals shall be those numbers of spawners needed to meet artificial production programs that are agreed to in accordance with the guidelines in Section 4 of this plan. For primary management units returning to natural spawning areas, the escapement goal shall be the maximum sustained harvest (MSH) escapement level.

3.5 Exceptions to primary management unit escapement goals may be allowed by agreement of the affected parties. When considering any exception, both long- and short-term costs and benefits must be adequately and openly quantified and considered to the extent possible. Potential exceptions include the following:

(1) Test fisheries

(2) Evaluation fisheries

(3) Ceremonial fisheries

(4) Management units for which a specific rebuilding schedule has been established

(5) Mixed-stock fisheries such as immobile fisheries in mixed-stock areas, recreational fisheries directed at maturing fish, fisheries outside management periods, and fisheries with unavoidable inter- and/or intra-specific harvest conflicts between primary management units

(6) Any other circumstance that is agreed to by all affected parties

3.6 The MSH escapement level will be estimated and documented annually for each management unit using the best available data and method.

3.7 If no reasonably accurate estimate of the MSH escapement level exists, the parties will employ the best agreed-to investigative technique to determine MSH. The investigative method used by the parties to better define the MSH escapement level must not intentionally result in escapements above or below the current best estimate of the MSH escapement level unless this escapement is necessary to the investigation.

3.8 The parties may agree to establish an escapement level for a primary management unit below which no exceptions will be allowed under any circumstances, unless expressly declaring that management unit secondary.

3.9 Escapement goals may be established for secondary units by agreement of all affected parties, and shall be based on expected escapement resulting from anticipated harvest patterns in all fisheries, including those fisheries that may occur subsequent to separation from primary units.

3.10 Escapement goals shall be established annually by agreement between the parties within the time frame outlined in Section 6 of this plan.

3.11 Except as otherwise agreed by all affected parties, escapement goals established under this section shall not be changed during the season.

4.0 EQUILIBRIUM BROOD PROGRAM

4.1 The affected parties shall reach agreement in a document on an equilibrium brood program, in conjunction with the development of the regional plans (Section 13).

4.2 The equilibrium brood document shall provide a description of the agreed-to equilibrium brood program. This document will express a description of each facility and its functions, including at least the following:

I. Operating Entity

II. Station/Facility Name

III. Station/Facility Description (characteristics)

IV. Species

Activity (transfer, release, etc.)

Number

Type (egg, fry, fingerling, etc.)

Size of Release/Transfer

Time of Release/Transfer

Preferred Stock

Destination (disposition of fish)

V. Station Contingency Plans (allowable operation alternatives)

VI. Comments/Footnotes

4.3 The equilibrium broad document as it exists on November 1 (or other

agreed-to date) provides the basis for the development of the future brood planning report, as outlined in Sections 5 (status reports) and 6 (schedules) of this plan.

4.4 No modifications may be made to the equilibrium brood program without prior agreement of the affected parties. Notice of proposed modification shall be provided at least 30 days prior to the proposed action, unless otherwise agreed to by the affected parties.

4.5 Changes or additions to the equilibrium brood program must be compatible with the management of primary management units and with the rights of the affected parties. Any party proposing a modification to the equilibrium brood program shall provide the following information:

I.   Name of Project

II.   Originating Entity

III.   Purpose

IV.   Analysis of benefits and costs, including at least consideration of species interactions, effects on genetic stock integrity, and cost-effective mitigation of adversely affected stocks

IV.   Analysis of benefits and costs, including at least consideration of species interactions, effects on genetic stock integrity, and cost-effective mitigation of adversely affected stocks

V.   Facility Characteristics

A.   Location

B.   Design

1.   Water Source

2.   Anticipated Watershed Modification

VI.   Species

Number

Activity (transfer, release, etc.)

Type (egg, fry, fingerling, etc.)

Size of Release/Transfer

Time of Release/Transfer

Preferred Stock

A.   Timing

B.   Disease History

C.   Source

Destination

VII.   Harvest Management Strategy

A.   Harvest Area

B.   Harvest Time

C.   Expected Exploitation Rate

D.   Conflicts With Other Stocks or Fisheries

E.   Allocation Implications

F.   Number of Adults Needed for Escapement

VIII.   Station Contingency Plans (addressing VI and VII)

IX.   Other Comments (marks, etc.)

5.0 TECHNICAL AND MANAGEMENT REPORTS AND DOCUMENTS

The timely exchange of Information and management recommendations is vital for the preparation of management options as well as for the review and performance auditing of the management actions undertaken by the parties. Management reports and documents prepared by the parties facilitate the management process by: a) presenting data, methods, analyses, and recommendations in an organized fashion; b) identifying areas of disagreement; and c) providing a basis from which the parties may proceed to technical and policy agreements. Annually, the parties shall provide the reports and documents listed below

within the time frame established in Section 6 of this plan.

5.1 Basic Resource Management Documents

Certain components of Puget Sound salmon management form the basis for specific annual management plans and are not expected to change significantly from year to year. Basic resource management documents describe these components separately from the detailed pre-season planning for a specific season, The parties shall jointly develop the following basic resource management documents and shall reach agreements on any modifications to these documents on an annual basis in accordance with the schedule in Section 6. The parties shall also reach agreement on the exact form of these documents (e.g., they may consist of annual written reports, computer files, a single source document with annual amendments, etc.), and which if any documents may be combined for simplicity.

5.1.1 One basic resource document shall be the equilibrium brood document described in Section 4 of this plan. Information to be included, procedures for modification, and schedules for reaching agreement are found in Sections 4 and 6.

5.1.2 A second basic resource document shall contain data and analyses for the establishment of management periods as described in Section 7. This should include the methods used to analyze run timing and should address general approaches to account for overlaps and gaps in run timing.

5.1.3 A third basic resource document shall contain the best current estimate of MSH escapements for management units, required in Section 3, and the data, analyses and methods used to establish these estimates. This document shall also contain agreed-upon methods for estimation of actual spawning escapements achieved each season.

5.1.4 A fourth basic resource document shall contain agreed-upon methods for conducting post-season run reconstruction. This document shall detail methods by area for post-season estimation of total run size for each Puget Sound management unit.

5.1.5 The parties may, by agreement, formulate other basic resource documents.

5.2 Pre–Season Management Reports

The ultimate goal of the pre-season planning process is to develop a fisheries management strategy acceptable to all parties. For each species, the parties shall jointly develop, in accordance with Section 6 of this plan, the following pre-season reports. The parties, by agreement, may choose to combine any of these reports to simplify the report generation process.

5.2.1 One pre-season report shall provide an assessment of the status of all management units which return and/or are harvested in Puget Sound and justification(s) for management recommendations. The following topics shall be included: (1) recommended management periods for each run by management area; (2) pre-season run size forecasts for each

management unit, including such background information as brood year escapement to natural spawning areas, quantities of off-station plants, and releases from hatcheries; (3) an outline of the methods and analyses used to compute the forecasts, along with quantitative measures of the degree of precision or confidence that can be applied to the forecasts; (4) recommended spawning escapement goals for each management unit and methods and rationale to determine them; (5) predicted levels of harvest and/or harvestable numbers, including expected incidental catches; (6) quantitative forecasts of prior interceptions and remaining allocations for each allocation unit and all background information and estimation methods used; (7) harvest management recommendations and justification for each management area covered by this plan; and (8) an outline of anticipated test and evaluation fishery needs.

5.2.2 A second pre-season report shall be the future brood planning report which will contain the following Information for each facility in the equilibrium brood document: (1) escapement needs and details of the utilization of adult spawners by species and stock, and (2) details of the rearing and release of juveniles by species and stock, transfers between facilities, marks to be applied, release location and schedule, and age, size and numbers of juveniles at release. In addition, this report shall indicate any anticipated deviations from the equilibrium brood document.

5.2.3 A third pre-season report shall contain methods to provide in-season estimates of run size and allocation. It shall also include methods to apportion catches from areas having a mixture of stocks from two or more regions of origin. Pre-season forecasts have often been found to be unreliable. In-season estimates of run sizes obtained during the passage of a run are direct measures of the quantity of fish present and are generally more accurate than pre-season forecasts. In-season run size estimates shall be made for every run unless the par ties agree that a usable updating method is not available. Topics in this report shall include: (1) a description of the quantitative methods (models) to be used for in-season run size estimation, the data or other information on which these models are based, quantitative indications of the reliability of the models, expected impact on escapements and/or allocations, and limitations on the use of the models; (2) methods for the in-season adjustment of management periods; (3) methods for the in-season adjustment of allocations; and (4) methods for apportioning mixed-stock catches to each management unit.

5.3 Post–Season Reports

A post-season audit report is necessary in order to permit an assessment

of the parties' annual management performance. in achieving spawning escapement, enhancement, harvest and allocation objectives. A post-season report will be jointly prepared by the parties. Differences among the parties in data or information interpretation shall be documented in this report. This report shall be prepared in accordance with the schedule in Section 6 and will generally include at least two years of information: preliminary data for the immediately preceding season and final data for prior years. The parties are encouraged to reach agreement on the various data and analyze components of this report as data become available throughout the year.

## 6.0 SCHEDULES

The various reporting and agreement requirements placed on the parties by this plan shall be fulfilled in accordance with the following scheduled deadlines for each species. Meeting these deadlines may necessitate omission of the most recent year of the data bases used to formulate run size forecasts.

| | Spring chinook | Sockeye | Summer/fall chinook | Pink | Coho | Chum |
|---|---|---|---|---|---|---|
| Basic resource management documents finalized | | | | 11/1 | | |
| Co-op egg requests received | 12/15 | 1/1 | 1/15 | 1/15 | 2/1 | 2/1 |
| Escapement estimates compiled and available | 12/15 | 1/15 | 2/15 | 2/15 | 3/1 | 3/15 |
| Preliminary PSF established[1] | -- | 12/1 | 1/8 | 12/1 | 1/8 | 1/8 |
| Post-season audit report and soft catch available | 1/1 | 1/23 | 3/1 | 3/1 | 3/15 | 3/15 |
| Recreational management proposals available | | | | 1/15 | | |
| Pre-season forecasts completed/exchanged | 1/8 | 2/1 | 3/8 | 3/8 | 3/23 | 4/23 |
| Pre-season recreational management planning completed | | | | 2/15 | | |
| Scale data available | | | | 3/1 | | |
| CWT data available | 3/1 | 3/1 | 3/1 | 3/1 | 3/15 | 3/15 |
| Resolution of pre-season forecast conflicts completed | 1/23 | 2/15 | 3/23 | 3/23 | 4/15 | 5/8 |
| Future brood egg requests, commercial management recommendations, and proposed escapement goals exchanged | 2/1 | 3/1 | 4/8 | 4/8 | 5/1 | 5/23 |
| Draft status and future brood reports completed/exchanged; including conflicting commercial management recommendations | 2/15 | 3/15 | 4/23 | 4/23 | 5/15 | 6/8 |
| Resolution of pre-season commercial management conflicts completed | 3/1 | 4/1 | 5/23 | 5/23 | 6/15 | 7/8 |
| Initial position statement on co-op egg requests sent out | 2/15 | 3/15 | 4/23 | 4/23 | 5/15 | 6/8 |
| In-season update methods exchanged/completed | 2/15 | 4/1 | 5/1 | 5/1 | 5/15 | 6/15 |
| Response from co-ops to initial position received | 3/1 | 3/23 | 5/8 | 5/8 | 6/1 | 6/23 |
| In-season update method conflicts resolved | 3/1 | 4/15 | 5/23 | 5/23 | 6/8 | 7/8 |
| Draft update method report released | 3/15 | 4/23 | 6/1 | 6/1 | 6/15 | 7/15 |
| Final position on co-op requests sent out | 3/15 | 4/15 | 6/1 | 6/1 | 6/23 | 7/15 |
| Final status and future brood reports released | 3/15 | 4/15 | 6/1 | 6/1 | 6/23 | 7/15 |
| Final update method report released[2] | 4/1 | 5/1 | 6/15 | 6/15 | 7/1 | 8/1 |
| Commercial hard data available | | | | 7/1 | | |
| Sport hard data available | | | | 8/1 | | |

[1] These estimates are subject to revision and are established by the parties to meet administrative procedures and the planning needs of other agencies such as PFMC.

[2] If hard catch data from the preceding year become available prior to use of agreed-to in-season update models, and these data would significantly alter the models, the parties should consider corrections to the models using hard data.

**Editor's Note:** The preceding image contains the references for footnotes: [1,2].

## 7.0 MANAGEMENT PERIODS

7.1 Proposed management periods shall be included in management reports developed under Section 5 of this Plan and agreed upon in accordance with time schedules of Section 6 of this Plan.

7.2 Adjustments of management periods may occur in season by agreement of the affected parties.

7.3 Management periods shall generally be based on the central 80% of the run timing of a management unit or group of management units in a management area unless otherwise agreed to by the parties.

7.4 Overlaps and gaps in management periods present fisheries managers with problems which will be unique to each situation and will vary as a result of such things as run timing patterns, fish size, run sizes and management goals. As a result, a single guideline to handle these problems is not feasible. Many overlaps where one or more species need protection may be handled by gear restrictions. In other cases, area or time restrictions may be used by the parties to achieve management goals during the overlap. The parties should reach agreement on methods to address overlap and gap situations on a case-by-case basis. Adjustments of Section 7.5 of this plan should be made after overlaps and gaps are addressed.

7.5 Management periods may be adjusted to begin on the nearest Sunday and end on the nearest Saturday to simplify processing of regulations.

## 8.0 TEST AND EVALUATION FISHERIES

Test and evaluation fisheries are valuable and necessary tools of fisheries managers. The use of these fisheries for data collection and other management needs is encouraged. The parties agree to jointly improve the methodologies used for test and evaluation fisheries.

8.1 General outlines of anticipated test and evaluation fisheries needs shall be included in draft, and final pre-season management reports developed under Section 5 of the plan.

8.2 Uses of test and evaluation fisheries include: maintenance of data continuity throughout a run; collection of fishing gear oriented data; collection of data for population parameter estimates (e.g., species and stock composition, run timing, abundance); and such other uses the parties agree are appropriate.

8.3 Certain criteria shall be evaluated before these proposed test and evaluation fisheries are implemented. These include, but may not be limited to: (1) whether the information to be collected is needed to meet in-season or general management needs; (2) whether the fishery will significantly impact escapement and/or allocation objectives; and (3) whether the pro-

---

1. These estimates are subject to revision and are established by the parties to meet administrative procedures and the planning needs of other agencies such as PFMC.

2. If hard catch data from the preceding year become available prior to use of agreed-to in-season update models, and these data would significantly alter the models, the parties should consider corrections to the models using hard data.

posed fishery is an appropriate method for collection of the desired data.

8.4 All test fisheries shall be monitored by fisheries management agency personnel (tribal or state, as applicable). The extent of monitoring necessary in any given test fishery should be determined on an individual test fishery basis. Any fish taken in test fisheries may not be sold for personal profit.

8.5 The information collected in a test fishery is to be made available to all parties in a timely manner.

## 9.0 HARVEST RATES

9.1 The following rules shall govern harvest management in all salmon fisheries, except as otherwise agreed by all affected parties.

9.2 Harvests of salmon in mixed-stock catch areas shall ensure that the weakest primary management unit is protected.

9.3 The maximum harvest rate for a management unit shall be defined as follows:

$$H = \frac{S - E}{S}$$

where,

H = the maximum harvest rate

S = the numerical abundance of a defined management unit based on the best available estimate of a run size (see Section 5)

E = the escapement goal applicable to the management unit.

9.4 The maximum harvest rates in each catch area shall be determined separately for each primary management unit, taking into account catches of that unit that have occurred or are expected to occur. Of the harvest rates computed for each catch area, the lowest rate shall prevail in the management of the area during the course of the run, provided, however, that all affected parties may agree to a lower harvest rate.

9.5 Harvest rates for each catch area shall be agreed upon between the state and all affected tribes on the basis of escapement goals agreed upon by the parties.

## 10.0 ALLOCATION OF HARVEST

10.1 Shares shall be computed separately for each species and region of origin, unless otherwise agreed by all affected parties.

10.2 Both the State and the tribes recognize that fisheries management is not sufficiently precise to provide a prescribed harvest allocation between treaty fishermen and non-treaty fishermen for every allocation unit each year. Therefore, if treaty or non-treaty fishermen are not provided the opportunity to harvest their share of any given allocation unit as provided by the orders of the federal court, deficiencies in numbers of fish shall be made up as provided in subsections 10.4 and 10.5, without any claim being necessary.

10.3 The parties agree to consider annually methods that provide management flexibility to achieve fair sharing of fish in ways that will minimize or eliminate the need for equitable adjustments. Methods to be considered include, but are not limited to, special fisheries, adjustments across regions or species, hatchery fish agreements, production increases or changes, stratified allocations, allocation of species separated by timing, and management refinements. The methods to be employed must be agreed to by all affected parties; they shall be decided upon

annually on a regional basis (except where more than one region is affected).

10.4 Shares will be calculated annually post-season, using preliminary data, by no later than one month after the date of the post-season audit report. Deficiencies in shares shall be adjusted annually unless neither party exceeded its share by more than 5% of the total of both parties' shares. Every four years an automatic adjustment will be made using final hard data as they become available. Provided, parties may agree to different arrangements on a regional basis.

10.5 Adjustments calculated pursuant to subsection 10.4 shall be made during the next year, or in as few years as possible, provided that repayment of a deficit in any one year shall be either:

A) 15% of that year's share of the party owing the adjustment,

or

B) 25% of the total deficit that was due,

whichever is greater. However, there may be either a greater or lesser repayment by agreement of the parties.

10.6 Any dispute over the existence, extent or implementation of a deficiency or imbalance shall be subject to the dispute resolution process of Section 14, except that whether or not to use the methods suggested in subsection 10.3 shall be based solely on agreement of all affected parties.

10.7 Fish taken in test fisheries pursuant to Section 8 do not count in either party's share.

10.8 Catches made in Puget Sound marine waters having a mixture of stocks from two or more allocation units will be apportioned in accordance with methods established pursuant to Section 5.2.3.

## 11.0 COORDINATED INFORMATION SYSTEMS

Coordinated information systems are the means by which the parties compile, exchange, and utilize fisheries resource management information. The coordinated information system shall contain resource data and information required for coordinated fisheries resource management. This information may be broadly classified into three categories.

11.0.1 Basic resource data, including both current and historic records of: catch, effort, spawning Information, production, tagging experiments, age distributions, regulations, etc. These data may be summarized in some convenient form but are generally not analytically derived, results.

11.0.2 Analytical tools and procedures consisting of methods used for run forecasting, updating, catch allocation, regulation, evaluation, escapement estimation, and other resource management tasks.

11.0.3 Biological parameters and analytical results, including resource inventory Information, mortality rates, etc.

11.1 Coordinated Information systems may be established by mutual agreement and include standards and procedures for the input and modification of fisheries resource management information. The following factors are essential components of standards and procedures.

11.1.1 Detailed and consistent documentation is fundamental to the utility of fishery resource management information. This documentation is necessary to ensure that

quality, consistency, and validity of information can be assessed by all parties. This documentation should include criteria useful in discriminating between alternative candidates for best available data, such as bias, precision, correlation coefficients and other statistical properties of estimation methods. Adequate documentation is a prerequisite to making an informed decision as to what constitutes the best available information for any management application.

11.1.2   The timeliness of information availability to all parties is crucial to the planning and regulatory processes. Deadlines for preparation and submission of management information will be in accordance with Sections 5 and 6 on reports and schedules.

11.1.3   Equal access to all fishery resources management information by all parties, for fisheries resource management purposes only, is indispensable. Equal access in this context implies the same ability in terms of similar time and cost of all parties to view and use information in the same form at the same time.

11.1.4   All information provided to the coordinated information system is the sole property of the party providing it. Disclosure of fisheries Information by a party to another party is not a waiver of confidentiality nor is it deemed to be a release of such information for purposes other than fisheries management planning and management under this plan. No party may voluntarily release information or data received from another party without that party's consent, whether to another party or an outside agency, including agencies of the United States Government. If a party is compelled by legal process to release such information, it shall do so only after notification to all affected parties. However, nothing herein is to be construed as relieving any party of any obligation under any law or any administrative or judicial order to timely furnish any information or data to any state, federal, or international governmental body or officer.

11.2   An important goal of the parties is to establish the best available data for fisheries resource management. The parties shall maintain a list of their completed, ongoing and proposed research studies which will include a project abstract available upon request of any party.

11.3   Catch Recording System. Reliable "soft" and "hard" data systems are needed for in-season fisheries management needs and for the finalizing of catch and effort statistics, respectively.

11.3.1   The hard and soft data systems shall include all commercial catches for treaty and non-treaty fishermen. The systems shall also include fishing effort information, ceremonial and subsistence catches, and the number of fish taken home by fishermen during commercial fisheries.

11.3.2   The soft data system shall provide current catch and effort information in an agreed-upon form as frequently as is necessary for in-season management purposes.

11.3.3   Fish buyers shall submit commercial catch reports to the appropriate agency on a daily basis on agreed-to forms (fish tickets) to be provided by the state.

11.3.4 Processing of fish tickets, collection of data, correction of errors, and finalization of data shall be carried out under an agreed-upon joint catch monitoring system which recognizes the need and responsibility of each party to correct its own fish ticket information. Primary emphasis will be on achieving completeness and accuracy in the initial preparation of the fish ticket. Further, the parties recognize the need for rapid entry of ticket information into the soft and hard data system.

11.3.5 Area descriptions to be used for catch recording shall be agreed to by the parties. Comparable commercial and recreational catch reporting areas are desirable.

11.3.6 Recreational catches shall be estimated through an agreed-upon sport catch estimation system established following a joint study to evaluate estimation methods.

12.0 TIMING AND CONTENTS OF FISHING REGULATIONS

12.1 The parties shall cooperatively maintain a system for transmitting, cross-indexing and storing fishing regulations affecting harvest of stocks covered by this plan. In cases of conflicting regulations, the system must identify the applicable regulations.

12.2 Annually, following the completion of management reports, the parties shall exchange pre-season commercial regulations containing at least information concerning number of units of each gear type by fishing area(s), and anticipated fishing pattern for each species, at least 10 days prior to fishing.

12.3 The filing of all emergency regulations shall be in accordance with the Order re: Notification and Effective Date of Emergency Regulations, dated 26 August 1980, *United States v. Washington* (W.D.Wash. No. 9213), except that Section 4 of the above order shall be amended such that on Friday, or a normal business day immediately preceding a holiday transmission times shall be limited to that period between 9:00 a.m. and 10:00 a.m.

12.4 The prior orders of this court which require 24–hour advance notice or FAB approval of proposed fishery openings are modified to permit waiver of such notice or FAB action when there is agreement by all the parties. Fisheries may be opened with less than 24–hour notice and without FAB action so long as proposed openings are communicated to and received by all affected parties (by TWX and personal contact) with a 4–hour notice minimum before the fishery opening (during normal working hours) and so long as no objection is made by any affected party. In addition to the notice requirement specified above, the party requesting waiver of the notice requirement shall make a written record of time and date of the request and the time and date that each affected party received the request. That written record shall be served on all affected parties. The parties recognize this provision is not be used for regular filing of regulations, but rather is reserved for emergency implementation only.

12.5 Each party's regulations should be filed as complete as possible and refer to previous regulations only when necessary.

12.6 The Washington Department of Fisheries' proposed annual recreational fishing regulations will be transmitted to the tribes by March 1.

13.0 REGIONAL MANAGEMENT PLANS

13.1 The parties shall develop comprehensive regional resource management plans for Puget Sound stocks. The goal of these plans shall be to achieve coordination between the affected parties and to eliminate potential conflicts in resource management strategy. These regional plans shall specifically address the provisions of this Plan as to which management units are primary and harvest management and enhancement strategies, with consideration of current and anticipated habitat status and management, research needs and priorities, and other matters as required by this plan. Regional plans shall be consistent with the pro visions of this plan. When regional plans are agreed to by the parties, they may be submitted to the court for incorporation into this plan.

14.0 DISPUTE RESOLUTION

14.1 It is the intention of the Department of Fisheries and the Puget Sound treaty tribes to conduct their business in such a way as to foster the voluntary, informal settlement of disputes. It is expected that through a cooperative planning and management process the parties will continue to resolve the vast majority of issues potentially dividing them. Through this process the parties agree to make litigation a last resort, to be avoided whenever possible.

14.2 In order to foster the continued vitality and refinement of this cooperative planning and management relationship, the Director of the Department of Fisheries and the Chairman of the Northwest Indian Fisheries Commission (or their designees) will jointly plan for and sponsor an annual pre-season meeting to be held no later than February 15 at which policy leaders and their technical advisors from all parties will meet. This meeting shall accomplish at least the following items:

14.2.1 Review and evaluate the previous year's cooperative planning and management activities and discuss ways to improve their working relationship in the coming season;

14.2.2 Identify issues which may potentially divide the parties or which have been identified in the past but have not yet been resolved and give to policy and/or technical subgroups or committees assignments and schedules for addressing these issues;

14.2.3 Agree on a schedule for meetings of state and tribal policy leaders, as needed, during the remainder of the calendar year;

14.2.4 Agree on a deadline by which each issue identified under subsection 14.2.2 will either be resolved, resolved for the coming season only so that a longer schedule can be used for a permanent solution, or referred to the pre-season dispute resolution process of subsection 14.3;

14.2.5 Identify those individuals (in addition to the Director of Fisheries and the Chairman of the Northwest Indian Fisheries Commission) who will have the authority to invoke the Dispute Resolution process. These designees shall be in policy/leadership positions;

14.2.6 Agree on individuals to serve on a panel of mediators and agree on the chair of that panel. The panel shall oversee both the pre-season and in-season dispute resolution processes described below;

14.2.7 Agree on individuals to serve on a Technical Advisory Group. These individuals shall be available as technical advisors to members of the panel;

14.2.8 Receive and discuss a report from the previous year's chair of the panel which describes the disputes, and particularly the types of recurring disputes, which were not being resolved through the cooperative planning and management process and therefore became the subject of Dispute Resolution;

and conduct such other business as they deem advisable.

14.3 Pre–Season Dispute Resolution

Should the cooperative planning and management process described in subsection 14.2 fail to adequately address or resolve a dispute, the dispute may be referred to policy persons designated under subsection 14.2.5. They may attempt to resolve the matter themselves without involving a mediator from the panel. If that attempt is unsuccessful, or immediately after the referral, either person may require the matter to be mediated. They may initiate mediation by notifying the chairman of the panel and the other involved party(ies). It shall be the responsibility of the chair to appoint a mediator from the panel.

14.3.1 The first step in the mediation shall be to reach agreement on the ground rules, including such matters as a description of the issue(s) in dispute, a listing of the parties to the dispute, a deadline by which the issue will be resolved, and whether the mediator shall be assisted by technical advisors. Unless any party objects, ground rules will include those specified in Section 14.3.5 A, B, D, E, F, G, H and L (except

delete the word "technical"). All parties shall be represented in the dispute by policy level, not technical, persons. Those representatives may have assistance from policy, legal and technical advisors, as they see fit. The mediator may have advisors only from the Technical Advisory Group as specified under 14.2.7.

14.3.2 The goal of the mediation shall be to reach agreement that will settle the dispute. If agreement is not achieved on an issue which both parties agree is technical, the parties must proceed to arbitration as provided in Section 14.3.4. If agreement is not reached on a policy or legal issue, either party may proceed to court, or they may agree to attempt further measures to resolve the dispute as provided in subsection 14.3.3.

14.3.3 Where mediation has failed to resolve a policy or legal dispute, the parties may agree to non-binding arbitration, binding arbitration, or other methods, using ground rules and standards as provided in 14.3.5 A through L (except delete the word "technical"), unless any party objects.

14.3.4 If mediation of a technical dispute has been unsuccessful, a Fisheries Advisory Board (FAB) meeting may be called as provided in the Order Establishing Fisheries Advisory Board, 459 F.Supp. at 1061 (as amended), provided, that the chair of the panel shall appoint a member of the Technical Advisory Group to act as chairman of the FAB in lieu of the court-appointed technical advisor. If no member of the Technical Advisory Group is available, the court-appointed technical advisor

shall act as chairman of the FAB. The FAB can only be called by a policy level person and each party shall be presented by a policy level person. An FAB is mandatory before a technical issue is taken to court. A decision by an FAB is binding pending a court determination or other resolution under 14.2.6.

14.3.5 Ground Rules for Technical Issue FAB Meetings

A) The chairmen shall conduct themselves in a manner appropriate to a neutral party and not to the prejudice of the interests of potential litigants.

B) Proceedings should be carefully documented to clearly describe the basis for any decision so as not to diminish:

1) the rights of any participant to seek judicial review;

2) the objectivity of the dispute resolution process; and

3) the usefulness of the record to policy makers.

C) The chairman should bring his expertise to bear on the dispute to facilitate resolution by the participants, but any decisions should be made upon the basis of Information presented during the dispute resolution proceedings. In making a decision, the chairman should apply principles and objectives outlined in this plan and should employ consistent standards of accountability regardless of whether the issue involved disputes over commercial or recreational fishing.

D) Reasons for requesting a technical dispute resolution proceeding should be presented in writing whenever time permits and ex-changed with necessary participants whenever practicable.

E) Once a technical dispute resolution proceeding is initiated, representatives of necessary resource managers must be made available. If reasonable efforts by the chairman to obtain representation fail, emergency technical dispute resolution proceedings can proceed with the chairman using the best available information.

F) Technical dispute resolution proceedings should be formalized through strict adherence to agendas which are arranged and agreed upon prior to the session whenever practicable. Documentation of areas of technical agreement and disagreement should be prepared by the disputants for use in the proceedings.

G) Information employed in technical dispute resolution proceedings must meet standards governing the coordinated information systems where such standards exist.

H) To the extent practicable, all participants must be provided with a reasonable opportunity to review data and analyses before using them in technical dispute resolution proceedings.

I) When an FAB has been called, disputants may not initiate contact with the FAB chair over matters of substance.

J) The full report of the FAB decision and proceedings, including any information submitted to the proceedings for consideration and deemed relevant by any participant, may be submitted as at least part of the record for judicial review.

K) Each disputant in a technical dispute resolution proceeding shall be provided a reasonable opportunity to review and comment upon the report of the technical dispute resolution proceedings before the report is made final. Comments received shall be considered part of the record of the dispute resolution proceeding. Proceedings may be recorded at the request of any disputant and any recording shall be made a part of the record. Reports of proceedings, together with a copy of the record before the proceedings shall be submitted to the parties to the dispute. Reports of proceedings shall be distributed to any fishery manager upon request. The decision and report shall be made in a timely fashion.

L) These general procedural ground rules can be modified for any particular dispute upon agreement of the participants.

14.3.6 Following the procedure of 14.3.3 and 14.3.4, policy leaders from the state and tribes shall meet to discuss the resolution of issues submitted to those procedures. They may then negotiate over any and all issues to attempt to reach a mutually agreeable settlement, regardless of the outcome from sections 14.3.3 or 14.3.4.

14.4 In–Season Dispute Resolution

The purpose of the in-season dispute resolution process is to provide a fair procedure through which timely and often immediate decisions can be made. As with pre-season disputes, it is the parties' intention and purpose to reach voluntary and mutually acceptable solutions to problems, particularly without the need to go to court. It is also recognized, however, that in-season settlements of disputes frequently will have to be made very quickly and with limited or conflicting available data. Therefore, the decisions reached through the in-season dispute resolution process shall be binding only for that season and shall not be considered precedential in any manner. For the purpose of this section, in-season will be defined as the period beginning 10 days prior to the management period for the expected species and area.

14.4.1 To the extent time is available, all parties are encouraged to use the procedures of 14.3.1, 14.3.2 and 14.3.3 to resolve in-season disputes. Where time is not sufficient, the parties are encouraged to find a temporary solution so that those issues may be deferred to the full processes of Sections 14.1, 14.2 and 14.3.

14.4.2 Where other resolutions are not possible for technical disputes, a party may request an FAB in the same manner as 14.3.4 and 14.3.5, and must request an FAB before proceeding to court.

14.4.3 Members of the technical advisory group and the court's technical advisors shall be certain at least one person is on call during all working hours and available to act as chairman of the FAB on 24 hours notice or less.

14.5 Where both parties agree, the dispute resolution process of 14.1 through 14.4 may be waived and the parties may proceed directly to court, provided, that for technical disputes an FAB must be held as provided in 14.3.4, 14.3.5 and 14.4.2.

14.6 There shall be review of this entire dispute resolution process by the parties at the annual meeting provid-

ed for in 14.2. The parties shall seek to agree on improvements and modifications of this process in order to promote voluntary and informal agreements and to avoid litigation of disputed issues.

14.7 The dispute resolution process of Section 14 shall automatically expire on December 31, 1986 unless before that date all parties have jointly filed a request with the Court to extend or modify that section. If Section 14 expires on December 31, 1986, the dispute resolution provisions of the Orders Establishing Fisheries Advisory Board, 459 F.Supp. at 1061, as amended, and Section 11 of the Memorandum Adoption Salmon Management Plan, 459 F.Supp. at 1107, 1113, shall be automatically reinstated.

### ORDER RE HOOD CANAL MANAGEMENT PLAN

No. 9213, Ph. I

(Proceeding 83–8)

(July 3, 1986)

McGOVERN, District Judge.

On October 6, 1983 the Point No Point Treaty tribes requested declaratory and injunctive relief to implement a Hood Canal Salmon Management Plan that had been agreed to in 1980. That request was referred to United States Magistrate John I. Weinberg for a Report and Recommendation. During the proceedings before the Magistrate the Point No Point Treaty tribes and the Washington Department of Fisheries agreed to settle their dispute by negotiation of a new Hood Canal Salmon Management Plan. The parties have now negotiated a new plan.

It is therefore ORDERED that:

1. The request of the Point No Point Treaty tribes for declaratory and injunctive relief is dismissed, and

2. The Hood Canal Salmon Management Plan, dated October 9, 1985, attached to this Order, is made an order of this Court and is enforceable as such.

### HOOD CANAL SALMON MANAGEMENT PLAN

#### 1.0 Preamble

1.1 This plan is the result of a series of discussions and negotiations between policy makers and the technical staffs of the parties with the intent of establishing a long-range management plan for salmon in Hood Canal. This plan is intended to comply with and address all regional issues required by the Puget Sound Salmon Management Plan and meet the guidelines for regional plans as suggested by the Salmon and Steelhead Conservation and Enhancement Act. This plan supersedes the previous Hood Canal Plan (signed December 30, 1980).

1.2 This plan recognizes that a detailed watershed management planning process is beginning for all of the Puget Sound sub-regions. It is understood that the Hood Canal Salmon Management Plan is one component in the development of an overall Puget Sound Regional Plan. It is also understood that tribal and state representatives who participated in developing the Hood Canal Plan will also be involved in the reconciliation process that is necessary between sub-regional plans and eventually regional plans; i.e., Puget Sound, Coast and Columbia River.

1.3 The purpose of this plan is to establish guidelines for the harvest, pro-

tection, rehabilitation and enhancement of salmon resources originating from or passing through Hood Canal waters from the mouth of Hood Canal southward.

1.4 This plan shall remain in effect from the date of the order approving it until modified by agreement of the parties or order of the Court.

1.5 This plan is intended to implement the decisions of the court in *United States v. Washington*, 384 F.Supp. 312 (W.D.Wash.1974), *aff'd* 520 F.2d 676 (9th Cir.1975), *cert. denied* 423 U.S. 1086, 96 S.Ct. 877, 47 L.Ed.2d 97 (1976), *aff'd sub nom., Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n,* 443 U.S. 658, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979) and other orders under the court's continuing jurisdiction, including in particular the Puget Sound Salmon Management Plan order.

## 2.0 Statement of Goals

The primary goal of this plan is to maximize the long term net benefits from the salmon resource, in a manner that provides clear policy and technical guidelines, minimizes disagreements, and improves coordination between the parties. The plan will form the framework for protection of natural stocks, provide guidance for programming existing salmon enhancement and rehabilitation facilities and the basis for review, implementation, and operation of future enhancement projects. It is also to serve as the basic guideline for implementation of the annual pre—and in-season management plans by the parties.

Consistent with the primary goal, three policy guidelines will be used when evaluating alternative management or enhancement programs. The technical staffs of each party shall seek to:

1. Minimize the need for intensive, limited area fisheries by enhancement of production in diverse areas;

2. Avoid over dependence of the fleet on any one species of salmon by providing a balanced approach to salmon production;

3. Maximize the stability of the fisheries from year to year.

This salmon management plan provides direct and indirect benefits to Treaty and non-Treaty commercial and recreational fishermen in Hood Canal. It is intended to ensure management in accordance with established Treaty rights and sound conservation principles, and to reflect the biological and economic policies of the management entities. Nothing in this plan is intended to preclude additional enhancement of the resource in Hood Canal in the future if additional facilities or funding should become available and such enhancement is consistent with the primary goals of this plan and is agreed to by the parties.

## 3.0 Definitions

### Required (MSH) Escapement

An estimate of the required escapement to natural spawning areas to provide maximum sustainable harvest (MSH) to Washington fisheries. At hatcheries, the escapement needed to meet the equilibrium brood program production level. Fisheries may or may not be managed to meet required escapements in accordance with the provisions of Section 3.5 of the Puget Sound Salmon Management Plan.

### Equilibrium Brood Program

The standard mode of operation for existing facilities/functions, associated with intervention in one or more of a salmon's life history phases.

## Management Unit

A stock or group of stocks which are aggregated for the purpose of achieving a desired spawning escapement.

## Parties

The Washington Department of Fisheries (WDF), the United States Fish and Wildlife Service (USFWS), and the Tribes (the Jamestown Klallam, Lower Elwha Klallam, Port Gamble Klallam, and Skokomish) make up the parties to this plan.

## Primary Management Unit

A stock or group of stocks for which a specific spawning escapement goal is established with the intention of managing all intercepting fisheries to meet that goal.

## Puget Sound Plan

The Puget Sound Salmon Management Plan, as agreed to between the parties and adopted by the U.S. District Court in 1985.

## Secondary Management Unit

A stock or group of stocks for which escapement is that which occurs primarily as a result of not being caught in fisheries directed at commingled primary management units.

## Technical Team

Representatives of the technical staffs of each party.

### 4.0 Habitat Management Policy

The parties believe that maintaining the integrity of habitat in both the marine and freshwater areas of Hood Canal is of the utmost importance in developing a dependable, stable, and economically viable fishery resource. The preservation, and where feasible, the rehabilitation and enhancement of fish habitat currently used or having the potential to be used by anadromous stocks is an integral part of this plan. The joint and cooperative efforts of the parties (including the maintenance and exchange of habitat information) will be needed to effectively monitor proposed activities with the potential to adversely affect habitat in Hood Canal. The parties also agree to encourage coordinated activities designed to improve the salmonid habitat. A habitat management data base will be assembled and it shall contain all available information related to salmonid habitats in Hood Canal, focusing on physical and biological descriptions. This data base will permit more specific identification of problems as well as available opportunities for needed rehabilitation of salmonid stocks in this area.

The classification within this plan of certain stocks as secondary for harvest management purposes should in no way be construed to mean that the habitat which is used by those stocks is of secondary importance. All habitat in Hood canal will be utilized to the optimum extent for the production of salmonids. In addition, the management regime presented in this plan is flexible, and alterations in the management status of the stocks (primary or secondary) may occur. Recognizing these facts, the parties reaffirm their commitment to protect the fisheries' habitat from environmental degradation.

### 5.0 Chinook Salmon Management and Enhancement

The equilibrium brood program, required escapement levels, run timing in each management area, and the management regime for chinook salmon are summarized in Appendix Tables 1–3 and in Appendix Figure 1.

### 5.1 Spring Chinook

The parties believe that an overall strategy for managing spring chinook in Puget

Sound is needed as mandated in existing court orders. Despite the present lack of a Puget Sound wide plan, it is evident that the protection and restoration of spring Chinook in Hood Canal is both desirable and feasible. The on-going restoration program at the Quilcene National Fish Hatchery provides a unique opportunity to rebuild natural stocks in Hood Canal. The long term goal of this program will be production of smolts at a level which provides adult returns at levels surplus to hatchery brood stock needs. This surplus

production will initially be stocked only in the Skokomish River and other tributaries to Hood Canal in an effort to rebuild natural stocks and provide for recreational and commercial harvests. Planting of Quilcene Hatchery stock into Strait of Juan de Fuca tributaries may occur if restoration using local stocks is unsuccessful or not feasible and the parties agree to the proposed project.

Prior to completion of this rebuilding process, the following management units are recognized:

| Management Unit | Status |
| --- | --- |
| Skokomish River (Natural) | Secondary |
| Quilcene National Fish Hatchery | Secondary |

No commercial net or sport fisheries directed at spring chinook in Hood Canal are anticipated at this time. To protect spring chinook from a directed harvest, Quilcene Bay (north and west of a line drawn from Pt. Whitney to Fishermen's Point) and the Skokomish River will remain closed during the spring chinook management period if the returning runs are below escapement needs. Additional restrictions in fisheries will be considered if sampling information indicates that fisheries are targeting on spring chinook in Hood Canal. The parties agree to the long term objective of rebuilding the Skokomish River and Quilcene Hatchery spring chinook stocks, by

utilizing the Quilcene Hatchery spring chinook program, so that these stocks may produce harvestable fish and be designated as primary stocks in the future. For the Skokomish River, this long term objective is dependent upon adequate protection of the remaining spring chinook habitat.

## 5.2 Summer/Fall Chinook

Summer/fall chinook salmon returning to Hood Canal will be managed to achieve the desired aggregate escapement at the George Adams/McKernan/Hoodsport complex. Management units and their status (primary or secondary) are listed below:

| Management Unit | Status |
| --- | --- |
| George Adams/McKernan Hatchery | Primary |
| Hoodsport Hatchery | Primary |
| Enetai Hatchery | Secondary |
| Skokomish River (Natural Augmented) | Secondary |
| Tributaries to Area 12B (Natural Augmented) | Secondary |
| Tributaries to Area 12D (Natural Augmented) | Secondary |

The maximum production capability of the marine waters of Hood Canal has not been quantified. In the absence of conclusive information, a probing approach to chinook production is needed to determine if production greater than the equilibrium brood program described in this Plan will affect the survival of chinook fingerlings released from hatcheries in Hood Canal. The approach to be used to resolve this issue is presented in Appendix 1. Agreed to variations in chinook production will be needed during the probing period and several potential options consistent with the probing methods exist:

1) Use the space (or a portion of it) currently used for the production of fish destined for South Sound for production of fish for release in Hood Canal. The parties agree that any increase in the production of chinook from facilities in South Sound beyond the current production of 31,540,000 fingerlings and 1,820,000 yearlings will result in a concomitant reduction in the production in Hood Canal of chinook destined for South Sound;

2) Rear fish destined for South Sound at stations outside of both South Sound and Hood Canal, and use the space thus vacated to produce additional fish for Hood Canal;

3) Convert some of the current chum production at State, Tribal or U.S.

facilities in Hood Canal to chinook production;

4) Produce yearling chinook from net pens in Hood Canal;

5) Improve existing and/or construct additional facilities.

The need or desirability for implementing these or other options will be evaluated during the annual plan review process. Any decisions made affecting South Sound management or production will be made in consultation with the South Sound Tribes and in a manner consistent with the Puget Sound Plan.

Chinook production in Hood Canal may also be increased by outplanting chinook fry in the major tributaries. However, the effectiveness of outplanting is unknown at this time, and a cooperative study should be undertaken before expansion of the current program.

## 6.0 Pink Salmon Management and Enhancement

The equilibrium brood program, required escapement levels, run timing in each management area, and the management regime for pink salmon are summarized in Appendix Tables 1–3 and in Appendix Figure 1.

Management units for pink salmon returning to Hood Canal and their status are listed below:

| Management Unit | Status |
| --- | --- |
| Tribs. to Area 12B (Natural) | Primary |
| Hoodsport Hatchery | Secondary (See Sect. 7.1) |

It is recognized that significant numbers of Hood Canal pink salmon may be intercepted by fisheries directed at Canadian stocks. Restrictions to protect weak Hood Canal natural stocks after separation from Canadian stocks may include area and gear restrictions which would provide satisfactory levels of protection without inordinate restrictions on the harvest of chinook salmon. The parties agree

to evaluate alternative methods of accomplishing this protection.

### 7.0 Coho Salmon Management and Enhancement

The equilibrium brood program, required escapement levels, run timing in each management area, and the management regime for coho salmon are summarized in Appendix Tables 1–3 and in Appendix Figure 1.

### 7.1 Early Coho

A pilot project to assess the feasibility of establishing an early coho run on Hood Canal is currently underway. During the evaluation phase, three early coho stocks (Soleduck, Baker, and Capilano) have been scheduled for release over a 6 year period commencing with the 1979 brood. Preliminary analysis of the project will be conducted in April of each year by the technical team to assess the viability of the project and determine escapement needs. A decision regarding the scope of the early coho enhancement project will occur in April of 1988 when results from the entire 6 year evaluation period are available.

To the extent that this enhancement planning decision may affect other parties by changing the escapement requirements of salmon stocks outside Hood Canal, those affected parties shall be consulted.

During the evaluation period early coho will be managed as a secondary stock with the harvest rate equal to that appropriate for summer/fall chinook (in areas 12, 12B, 12C) normal coho (in areas 12, 12B, and 12C) and pink salmon (in areas 12, 12B) during their respective management periods. Any unharvestable surplus shall not be included in the calculation of shares.

### 7.2 Normal Coho

Normal timed coho salmon will be managed to achieve the desired level of escapement to the natural spawning areas of Hood Canal except in Area 12A and in Area 9A. Management units and their status (primary or secondary) are listed below:

| Management Unit | Status |
|---|---|
| Tribs. to Area 12 (Natural) | Primary |
| Tribs. to Area 12B (Natural) | Primary |
| Tribs. to Area 12C (Natural) | Primary |
| Tribs. to Area 12D (Natural) | Primary |
| Skokomish River (Natural) | Primary |
| George Adams Hatchery | Secondary |
| Quilcene National Fish Hatchery | Secondary (except in Area 12A) |
| Area 9A Pens | Secondary |
| Tribs. to Area 9A (Natural) | Secondary |
| Area 12A Pens | Secondary |
| Tribs. to Area 12A (Natural) | Secondary |

Fisheries in Area 12A and the Quilcene River will be managed to achieve the desired escapement at the Quilcene National Fish Hatchery; the fishery in Area 9A will be managed to achieve the complete harvest of coho in that area. An unharvestable surplus will occur at George Adams hatchery. These fish shall not be included in the calculation of shares except as may be agreed to by the parties.

The pen rearing projects in Area 12A and in Area 9A are cooperative programs between the WDF and the Tribes. The purpose of these programs is not only to provide additional harvest, but to also provide a better distribution of harvest among areas. It will be the responsibility of the Tribes to provide the labor and materials to maintain these facilities, while the Washington Department of Fisheries will provide the smolts and fish food.

Consistent with the primary goals of this plan, the parties have considered several alternative management and enhancement measures designed to maintain and increase the harvest of coho salmon in Hood Canal. Some of the measures considered are:

1. Increasing annual production from the Area 12A pens beyond the currently scheduled .25 million smolts.

2. Changing the status of the Skokomish natural stock to a secondary stock, increasing production from the George Adams Hatchery, and managing the Skokomish River fishery to achieve the desired escapement at the George Adams Hatchery;

3. Outplanting coho fry in natural production areas which are underseeded.

4. Implementation of the equilibrium brood program described in the Plan.

Because of concerns, and/or present uncertainties over natural stocks, interspecific interactions, habitat carrying capacities, and the level of potential impacts to the areal distribution of harvests, the parties have agreed to initially implement the management and enhancement programs outlined herein and to reassess each of these options, and others which may arise, during the annual technical review process.

### 8.0 Chum Salmon Management and Enhancement

The equilibrium brood program, required escapement levels, run timing in each management area, and the management regime for chum salmon are summarized in Appendix Tables 1–3 and in Appendix Figure 1.

### 8.1 Early Chum

Early timed chum salmon in Hood Canal will be managed as secondary stocks. Harvest will occur at the rate appropriate for Chinook salmon during the Chinook management period and at the rate appropriate for coho during the coho management period.

| Management Unit | Status |
| --- | --- |
| Tribs. to Area 12A (Natural) | Secondary |
| Tribs. to Area 12B (Natural) | Secondary |
| Tribs. to Area 12C (Natural) | Secondary |
| Tribs. to Area 12D (Natural) | Secondary |

## 8.2 Hoodsport Hatchery Timed Chum (Early–Normal Chum)

Chum salmon returning during the same time period as the Hoodsport Hatchery timed stocks shall be managed to achieve the desired aggregate escapement at the Hoodsport/George Adams/McKernan complex. Management units and their status (primary or secondary) are listed below:

| Management Unit | Status |
| --- | --- |
| Hoodsport Hatchery | Primary |
| George Adams/McKernan Hatchery | Primary |
| Skokomish River (Natural) | Secondary |
| Tribs. to Area 12 (Natural) | Secondary |
| Tribs. to Area 12A (Natural) | Secondary |
| Tribs. to Area 12B (Natural Augmented) | Secondary |
| Tribs. to Area 12C (Natural Augmented) | Secondary |
| Tribs. to Area 12D (Natural Augmented) | Secondary |
| Little Boston Hatchery | Secondary |
| Quilcene National Fish Hatchery | Secondary |
| Enetai Hatchery | Secondary |

It is recognized by the parties that not all chum returning to Hood Canal have similar timing. For this reason, only the proportion of the management unit entering Hood Canal during the hatchery management period (Appendix Table 2) shall be considered harvestable at the rate appropriate for the primary management units. Although the initial portion of the late-normal run will be harvested at a hatchery rate, it is the intent of the parties to achieve, to the extent possible, the biologically required escapements for these stocks by appropriate management actions after the end of the early-normal management period. The parties shall determine the feasibility of accomplishing this after further analysis of the entry timing difference between the Hoodsport and late-normal stocks.

To protect natural stocks in the Skokomish River, the original Hood Canal Plan called for the transfer of 50% of the production from the hatcheries located on the Skokomish River to other areas in Hood Canal. It appears that the timing overlap of hatchery and natural stocks in the Skokomish River may not now require that hatchery fry be transported out of the Skokomish system. However, the potential exists that a shift in the preponderance of production from the Hoodsport Hatchery to stations on the Skokomish River could result in a large number of harvestable fish in the Skokomish River. This would alter the areal distribution of harvest and would be detrimental to the Tribes' marine area fisheries. The parties agree to limit the transfer of production from Skokomish River hatcheries to 50% of the George Adams hatchery only, beginning with the 1985 brood year, and to assess the transfer program with respect

to 1) the beneficial/harmful effects on the return rate caused by the transfer of the fish, 2) the protection afforded to natural stocks in the Skokomish River, and 3) shifts in the areal distribution of harvest.

Future decisions concerning the transfer program shall be based on the results of these assessments.

The WDF and the Tribes have cooperated in the operation of an egg box program designed to mitigate for the effects of hatchery harvest rates. The effectiveness

of this program is presently unknown; therefore the parties have agreed to reassess the program and recommend modification, improvement, or discontinuance, as appropriate.

### 8.3 Late–Normal Chum

Chum salmon returning after the hatchery chum management period will be harvested at a rate appropriate for natural stocks, except in Area 12A and in Area 9A. Management units and their status (primary or secondary) are listed below:

| Management Unit | Status |
| --- | --- |
| Skokomish River (Natural) | Primary |
| Tribs. to Area 12A (Natural) | Secondary |
| Tribs. to Area 12B (Natural) | Primary |
| Little Boston Hatchery | Secondary |
| Enetai Hatchery | Secondary |
| Quilcene National Fish Hatchery | Secondary (except in Area 12A) |

### 9.0 Implementation Procedures

### 9.1 Escapement

In order to establish the levels of required escapements for the various management units and stocks in Hood Canal, the parties shall follow the procedures outlined in Section 3 of the Puget Sound Plan.

### 9.2 Management Reports and Documents

The parties recognize that long term as well as annual management planning processes depend on timely exchange of resource management information and management planning recommendations. These will be prepared by the parties as follows:

### 9.2.1

Basic resource management documents shall be prepared in accordance with this Plan's goals and in a manner outlined in Section 5 of the Puget Sound Plan. Initial-

ly, Appendix Tables 1 and 2 of this Plan shall be considered the basis for such resource documents.

### 9.2.2

Annual preseason and post season management reports shall be prepared by the parties in accordance with Section 5 of the Puget Sound Plan. In addition to the requirements of the Puget Sound Plan regarding post-season audit reports, and in the same time frame, the parties shall prepare annually a report outlining the progress toward implementation of this Plan's primary goals as well as any recommendations for amendments to this Plan.

### 9.3 Schedules

The parties to this Plan shall undertake to complete annual reporting and agreement tasks in accordance with the annual Schedule found in Section 6 of the Puget Sound

Plan. Additional deadlines required by this Plan are: ·

| | |
|---|---|
| Plan progress report available: | 3/15 |
| Agreement on proposed activities and amendments: | 4/15 |

### 9.4 Allocation

Allocation and equitable adjustment procedures for each Hood Canal allocation unit shall be as outlined in Section 10 of the Puget Sound Plan.

### 9.5 Plan Review and Amendment

The parties recognize that this plan cannot possibly address all potential concerns regarding the management of salmon in the Hood Canal region. For this reason, it is imperative that an annual review process occur to evaluate the performance of the plan and to provide for necessary, modifications. This review shall occur in accordance with the schedule in section 9.3. Any amendment of the plan shall be by agreement of the parties.

### 9.5.1

In the event of budget reductions affecting WDF, USFWS or Tribal production programs, high priority will be given to maintaining the programs in Hood Canal, but in no case will the loss of production in Hood Canal be disproportionate to the overall cutback in the aggregate of the WDF, USFWS or Tribal facilities. The parties shall be apprised of the situation, consulted, and given an opportunity to ameliorate the effects of the budget cuts.

### 9.5.2

Changes to this plan may be agreed to by a signed stipulation filed with the court or entered as a court order by June 1 in order to become effective the following year. Changes may be implemented in the same year by agreement of the parties.

### 9.5.3

The parties to this plan recognize that many of the benefits of this plan depend upon the sharing of hatchery production. Therefore, if the United States Supreme Court makes any decision which changes or leads to a change in the tribes' right to share all hatchery fish on the same basis as naturally produced fish, any one of the parties may at their sole option elect to terminate this plan. Provided that, prior to such termination, the parties shall make every effort to agree on modifications to this plan to fit new circumstances. ·

### 9.6 Dispute resolution

The parties to this Plan recognize the value of voluntary, informal settlement of disputes and shall make every effort to resolve disputes through a cooperative planning and management process.

### 9.6.1

Disputes which may arise regarding the implementation and/or amendments to this Plan shall be submitted to the Dispute Resolution Process outlined in Section 14 of the Puget Sound Plan.

### 9.6.2

In the event a disagreement over the interpretation, implementation or enforcement of this plan is not resolved through the dispute resolution process required by Section 9.6.1, any dissatisfied party may seek a determination in federal district court. The court shall remain the ultimate arbiter of this plan's interpretation, implementation and enforcement.

Appendix 1.

Procedure and Schedule for Analyzing Chinook Enhancement Programs

The time schedule and procedure which will be used to analyze chinook enhancement programs in Hood Canal is presented below.

| Time Period | Task |
| --- | --- |
| 5–6/85 | 1. Determine needed improvements in the lower earthen pond at the George Adams Hatchery. |
| 6/85 | 2. Decision regarding the production of chinook from the lower earthen pond at the George Adams Hatchery. |
| 3/86 | 3. Evaluate the desirability of increasing chinook production from the Enetai Hatchery. |
| 4/86 | 4. Decision regarding increasing the production of chinook from the Enetai Hatchery. |
| 4/86 | 5. Tag chinook fingerling at the Hoodsport Hatchery for evaluation of the equilibrium enhancement level. |
| 4/86 | 6. Tag chinook fingerling at the Enetai Hatchery for production evaluation. |
| 4/86 | 7. Tag chinook fingerlings in the lower earthen pond at the George Adams Hatchery for production evaluation. |
| 4/87 | 8. Tag chinook fingerlings at the Hoodsport Hatchery for evaluation of the equilibrium enhancement level. |
| 4/87 | 9. Tag chinook at the Enetai Hatchery for production evaluation. |
| 4/87 | 10. Tag chinook fingerlings in the lower earthen pond at the George Adams Hatchery for production evaluation. |
| 4/88 | 11. Review baseline tag data available? determine future course of Hood Canal smolt capacity experiment. |

Tasks 5, 8, and 11 will be undertaken as one component of a program to evaluate the juvenile rearing capacity of Hood Canal. To prevent confounding of the results of this experiment, sources of variability such as inconsistent rearing and release strategies will need to be minimized. Chinook fingerling from the Hoodsport Hatchery were chosen for the experiment as a more complete coded wire tag data base is available than for the George Adams Hatchery. In addition, unlike the George Adams Hatchery stock, the Hoodsport Hatchery stock has been relatively free from supplementation from stocks from outside Hood Canal. Coded wire tag data applicable to Hoodsport Hatchery fingerling production and expected to be available at the next decision point in the experiment (4/88) are listed below.

| Brood Year | Date Available | Tag[1] Codes | Fingerling Pounds Planted in Hood Canal |
|---|---|---|---|
| 71 | Currently | –01–03, 15–01–12 | 54,917 |
| 72 | Currently | 15–05–12 | 70,314 |
| 78 | Currently | 63–19–15 | 9,639 |
| 79 | 86 | 63–21–09 | 15,381 |
| 80 | 87 | 63–21–61 | 34,203 |
| 81 | 88 | 63–23–31 | 40,049 |
| 85 | 92 | — | 55,000–68,000 (projected) |
| 86 | 93 | — | 55,000–68,000 (projected) |

1. Additional tag groups may be included, as appropriate, by agreement of the parties.

Appendix Table 1. Equilibrium brood program.

The equilibrium brood program described below represents production programs and volumes of production agreed to between the parties during formulation of this plan. Numbers of "fish released" may vary within ±10% because of management and production imprecision.

Additional information concerning these programs may be found in the Puget Sound Equilibrium Brood Program Report mandated by the Puget Sound Plan. That information includes egg requirements, broodstock use priorities and outlines of contingency action for each project.

| Facility | Stock | Source | Fish (millions) | Size (fish/lb) | Transfer/ Release Location | Transfer/Release Date |
|---|---|---|---|---|---|---|
| **SPRING CHINOOK SALMON** - Production for release in the Hood Canal region. | | | | | | |
| Quilcene National Fish Hatchery | Quilcene | Quilcene | .40 | 15 | Quilcene River | May |
| Quilcene National Fish Hatchery | Quilcene | Quilcene | .20 | 65 | Quilcene River | June |
| **SUMMER/FALL CHINOOK SALMON** - Production for release in the Hood Canal region. | | | | | | |
| George Adams Hatchery | George Adams (Hoodsport) | George Adams (Hoodsport) | 3.70[4] | 100 | Purdy Creek | May, June |
| George Adams Hatchery | George Adams (Hoodsport) | George Adams (Hoodsport) | .50[3] | 500 | Hood Canal streams | March |
| McKernan Hatchery | George Adams (Hoodsport) | George Adams (Hoodsport) | .60 | 100 | Weaver Creek | May, June |
| Hoodsport Hatchery | Hoodsport (George Adams) | Hoodsport (George Adams) | 1.20 | 100 | Finch Creek | May, June |
| Hoodsport Hatchery | Hoodsport | Hoodsport | .15 | 10 | Finch Creek | March |
| Enetai Hatchery | Enetai (Hoodsport) | Enetai (Hoodsport) | .27[5] | 100 | Enetai Creek | June |
| Enetai Hatchery | Enetai (Hoodsport) | Enetai (Hoodsport) | .30 | 400 | Skokomish River | March |
| **SUMMER/FALL CHINOOK SALMON** - Production for release outside the Hood Canal region. | | | | | | |
| George Adams Hatchery | Deschutes | Deschutes | .60 | 25 | Percival Cove | January |
| McKernan Hatchery | Deschutes | Deschutes | .60 | 25 | Percival Cove | January |

| Facility | Stock | Source | Fish (millions) | Size (fish/lb) | Transfer/ Release Location | Transfer/Release Date |
|---|---|---|---|---|---|---|
| PINK SALMON - Production for release in the Hood Canal region. | | | | | | |
| Hoodsport Hatchery | Hoodsport | Hoodsport | 1.00 | 1,000 | Finch Creek | March |
| COHO SALMON - Production for release in the Hood Canal region. | | | | | | |
| George Adams Hatchery | George Adams | George Adams | .25[3] | 1,000 | Hood Canal streams | March |
| George Adams Hatchery | George Adams | George Adams | .30 | 17 | Purdy Creek | May |
| Hoodsport Hatchery | Soleduck, Baker, Capilano | Dungeness | .25 | 15 | Finch Creek | June |
| Area 12A Pens | Dungeness | Dungeness | .25 | 12 | Area 12A | July |
| Port Gamble Pens | Dungeness | Dungeness | .40 | 12 | Area 9A | July |
| Quilcene National Fish Hatchery | Quilcene | Quilcene | .25 | 450-800 | Area 12A Tribs. | February, March |
| Quilcene National Fish Hatchery | Quilcene | Quilcene | .25 | 18 | Quilcene River | May |
| COHO SALMON - Production for release outside the Hood Canal region. | | | | | | |
| George Adams Hatchery | George Adams | George Adams | .25[3] | 1,000 | South Sound streams | April |
| George Adams Hatchery | George Adams | George Adams | .50 | 30 | South Sound pens | February |
| Hoodsport Hatchery | Minter Creek | Minter Creek | .40 | 35 | Lake Sequalitchew | November |
| CHUM SALMON - Production for release in the Hood Canal region. | | | | | | |
| George Adams Hatchery | George Adams (Hoodsport) | George Adams (Hoodsport) | 5.00 | 450-800 | Purdy Creek | March, April, May |
| George Adams Hatchery | George Adams (Hoodsport) | George Adams (Hoodsport) | 5.00 | 450 | Hoodsport Hatchery | April, May |
| McKernan Hatchery | McKernan (Hoodsport) | McKernan (Hoodsport) | 10.00 | 550 | Weaver Creek | Feb., March, April |

| Facility | Stock | Source | Fish (millions) | Size (fish/lb) | Transfer/ Release Location | Transfer/Release Date |
|----------|-------|--------|-----------------|----------------|----------------------------|------------------------|

**CHUM SALMON** – Production for release in the Hood Canal region (continued).

| Facility | Stock | Source | Fish (millions) | Size (fish/lb) | Transfer/ Release Location | Transfer/Release Date |
|----------|-------|--------|-----------------|----------------|----------------------------|------------------------|
| Hoodsport Hatchery | George Adams | George Adams | 5.00 | 385 | Finch Creek | March, April, May, June |
| Hoodsport Hatchery | Hoodsport | Hoodsport | 10.00 | 385 | Finch Creek | March, April, May, June |
| Enetai Hatchery | Enetai | Enetai | 1.00 | 1,100 | Enetai Creek | March |
| Enetai Hatchery | Enetai | Enetai | 1.50 | 400 | Enetai Creek | May |
| Little Boston Hatchery | George Adams (Hoodsport) | George Adams (Hoodsport) | .95 | 400 | Little Boston Creek | May |
| Port Gamble Pens | Hoodsport (George Adams) | Hoodsport (George Adams) | 1.80 | 400 | Area 9A | May |
| Quilcene National Fish Hatchery | Quilcene | Quilcene | 2.20 | 550 | Big Quilcene River[1] | April |
| Egg Boxes | Hoodsport (George Adams) | Hoodsport (George Adams) | 1.50 | 1250 | Tahuya R.[2] | March |
|  |  |  | 0.15 | 1250 | Anderson Crk.[2] | March |
|  |  |  | 0.15 | 1250 | Caldervin Crk.[2] | March |
|  |  |  | 0.15 | 1250 | Stimson Crk.[2] | March |
|  |  |  | 0.15 | 1250 | Union R.[2] | March |
|  |  |  | 0.15 | 1250 | Twanoh Crk.[2] | March |
|  |  |  | 1.00 | 1250 | Johnson Crk.[2] | March |
|  |  |  | 0.50 | 1250 | Fulton Crk.[2] | March |
|  |  |  | 2.00 | 1250 | Eagle Crk.[2] | March |
|  |  |  | 0.50 | 1250 | John Crk.[2] | March |
|  |  |  | 0.50 | 1250 | L. Lilliwaup R.[2] | March |

**CHUM SALMON** – Production for release outside the Hood Canal region.

| Facility | Stock | Source | Fish (millions) | Size (fish/lb) | Transfer/ Release Location | Transfer/Release Date |
|----------|-------|--------|-----------------|----------------|----------------------------|------------------------|
| Quilcene National Fish Hatchery | Quilcene | Quilcene (Walcott) | 2.20 | Eggs | Makah NFH | March |

[1] 25% of the production will be released in Walcott Slough in 1986 and 1987.

[2] Egg box program

[3] Actual distribution to be established annually.

[4] The equilibrium brood includes .5 million (@ 100/lb) to be reared at the George Adams lower earthen pond. The parties agree that this component may be increased to 1 million or eliminated based on the results of technical analysis which would weigh long term benefits vs. potential losses due to flooding.

[5] The parties agree that a modification of the Enetai program to increase production of chinook fingerlings by .36 million at the expense of chum production is desirable if technical analysis indicates that the program has been successful at its current production level.

Note: The following list of escapement requirements outlines the escapement goals used by the parties during the 1985 season. All requirements shall be reviewed and revised annually in accordance with Section 3.5 of the Puget Sound Salmon Management Plan. Any in-season changes to hatchery escapements shall be made in accordance with Section 3.11 of the Puget Sound Management Plan.

| Management unit (& Prod. Units) | Spr. Chin. | S/F Chin. | Pink | Coho | Early Chum | E-Normal Chum | L-Normal Chum |
|---|---|---|---|---|---|---|---|
| **Natural Production** | | | | | | | |
| Area 9A Tribs | --- | --- | --- | $200^2$ | --- | --- | --- |
| Area 12 Tribs (Big Beef Creek) (Misc. Tribs.) | --- | --- | --- | 1,300 | --- | $1,100^2$ | --- |
| Area 12A Tribs. (Big Quilcene R.) (Little Quilcene R.) (Tarboo Crk.) (Misc. Tribs.) | --- | --- | --- | $1,000^2$ | $2,300^2$ | | $1,000^3$ |
| Area 12B Tribs. (Dosewallips R.) (Duckabush R.) (Hamma Hamma R.) (Misc. Tribs.) | --- | $750^2$ | 1/ | 3,000 | $11,100^2$ | | $10,100^3$ |
| Area 12C Tribs. (Dewatto R.) (Misc. Tribs.) | --- | --- | --- | 2,500 | $3,300^2$ | $5,000^2$ | --- |
| Area 12D Tribs. (Tahuya R.) (Union R.) (Misc. Tribs.) | --- | $400^2$ | --- | 6,400 | $3,300^2$ | $7,300^2$ | --- |
| Skokomish R. | 1/ 2/ | $1,650^2$ | --- | 4,250 | --- | | $7,500^3$ |

| Management unit (& Prod. Units) | Spr. Chin. | S/F Chin. | Pink | Coho | Early Chum | E-Normal Chum | L-Normal Chum |
|---|---|---|---|---|---|---|---|
| **Artificial Production** | | | | | | | |
| Area 9A Pens | ---- | ---- | ---- | ---- | ---- | ---- | ---- |
| Area 12A Pens | ---- | ---- | ---- | ---- | ---- | ---- | ---- |
| Little Boston Hatchery | ---- | ---- | ---- | ---- | ---- | ---- | ---- |
| Quilcene Nat'l Fish Hatchery | 500[2] | ---- | ---- | 600[2] | ---- | ---- | 3,100 |
| Hoodsport Hatchery | ---- | 2,800[4] | 1,100[2] | 0 | ---- | 22,600[5] | ---- |
| Enetai Hatchery | ---- | 350[2] | ---- | ---- | ---- | ---- | 1,900[2] |
| Geo. Adams/McKernan Hatchery | ---- | 800[4] | ---- | 1,500[2] | ---- | 8,400[5] | ---- |

[1] The parties shall assess and establish escapement requirements prior to 1987.

[2] Secondary management unit.

[3] Present combined escapement requirement (see Sections 8.2, 8.3). The parties shall establish appropriate levels of escapement.

[4] Total escapement need of 3,600 fish; proportion to be taken at each facility will depend upon the management objectives in each year.

[5] Total escapement need of 31,000 fish; proportion to be taken at each facility will depend upon the management objectives in each year.

Appendix Table 3. Management periods (prior to administrative adjustment) for areas in Hood Canal (continued).

| Mgmt. Area | Spring Chinook | Summer/Fall Chinook | Pink | Coho | Early Chum | Normal Chum | Late Chum |
|---|---|---|---|---|---|---|---|
| | | | | **Species** | | | |
| 9A | - | - | - | 9/18-11/11 | - | 11/12-12/21 | - |
| 12 | 4/14- 6/29 | 7/17- 9/6 | 7/16- 8/24 | 9/7 -10/16 | 8/16- 9/22 | 10/17-11/20 | 11/21-12/7 |
| 12A | 4/14- 6/29 | - | - | 9/1 -10/13 | 8/26- 9/26 | 10/14-11/18 | 11/19-12/21 |
| 12B | 4/14- 6/29 | 7/17- 9/6 | 7/16- 8/24 | 9/7 -10/16 | 8/16- 9/22 | 10/17-11/20 | 11/21-12/14 |
| 12C | 4/14- 6/29 | 7/24- 9/8 | 7/23- 8/31 | 9/9 -10/24 | 8/26- 9/26 | 10/25-11/27 | 11/28-12/21 |
| 12D | - | 7/24- 9/8 | - | 9/9 -10/24 | 8/26- 9/26 | 10/25-11/27 | - |
| Quilcene R. | 4/14- 8/31 | - | - | 9/1 -11/9 | 9/8 -10/19 | 11/10-11/25 | 11/26-12/21 |
| Dosewallips R. | - | 8/6 - 9/19 | 9/1 -10/19 | 9/20-11/7 | 9/8 -10/19 | 11/8 -11/30 | 12/1 - 1/4 |
| Duckabush R. | - | 8/6 - 9/19 | 9/1 -10/19 | 9/20-11/7 | 9/8 -10/19 | 11/8 -11/30 | 12/1 - 1/4 |
| Hamma Hamma R. | - | 8/6 - 9/19 | 9/1 -10/19 | 9/20-11/7 | 9/8 -10/19 | 11/8 -11/30 | 12/1 - 1/4 |
| Skokomish R. | 4/14- 7/25 | 8/6 - 9/19 | - | 9/20-11/7 | - | 11/8 -11/30 | 12/1 - 1/4 |
| Tahuya R. | - | 8/6 - 9/19 | - | 9/20-11/7 | 9/8 -10/19 | 11/8 -11/30 | - |

Tributaries other than those listed above:

| Mgmt. Area | Spring Chinook | Summer/Fall Chinook | Pink | Coho | Early Chum | Normal Chum | Late Chum |
|---|---|---|---|---|---|---|---|
| 9A Tribs. | - | - | - | 9/18-11/7 | - | 11/8 -11/30 | - |
| 12 Tribs. | - | - | - | 9/18-11/7 | - | 11/8 -11/30 | - |
| 12A Tribs. | - | - | - | 9/1 -11/7 | 9/8 -10/19 | 11/8 -11/25 | 11/26-12/21 |
| 12B Tribs. | - | - | - | 9/18-11/7 | 9/8 -10/19 | 11/8 -11/30 | 12/1 - 1/4 |
| 12C Tribs. | - | - | - | 9/18-11/7 | 9/8 -10/19 | 11/8 -11/30 | - |
| 12D Tribs. | - | - | - | 9/18-11/7 | 9/8 -10/19 | 11/8 -11/30 | - |

1121

Appendix Figure 1. Summary of the management regime in each management area of Hood Canal. The management unit controlling the harvest rate is given below the management period.

Date

| Mgmt. Area | 5/1 | 6/1 | 7/1 | 8/1 | 9/1 | 10/1 | 11/1 | 12/1 | 1/1 |

Area 12

Spring Chinook
|—————————————|
4/14          6/29
Skokomish River Natural

Summer/Fall Chinook
|——————————————|
7/17          9/6
Hoodsport Hatchery
(with pink restrictions)

Coho
|————|
10/16
12,12B,12C,
Skok. R., or
12D natural

Early
Normal Chum
|———|
11/20
12,12B, or
Skok. R.
natural

Late
Nrml Chum
|———|
12/7
Hoodsport
Hatchery

W. Stlhd.
|—|

Area 12B

Spring Chinook
|—————————————|
4/14          6/29
Skokomish River Natural

Summer/Fall Chinook
|——————————————|
7/17          9/6
Hoodsport Hatchery
(with pink restrictions)

Coho
|————|
10/16
12B, 12C,
Skok. R., or
12D natural

Early
Normal Chum
|———|
11/20
12B, or
Skok. R.
natural

Late
Nrml Chum
|———|
12/14
Hoodsport
Hatchery

W. Stlhd.
|—|

Area 12C

Spring Chinook
|—————————————|
4/14          6/29
Skokomish River Natural

Summer/Fall Chinook
|——————————|
7/24          9/8
Hoodsport Hatchery

Coho
|————|
10/24
12C, 12D,
or Skok. R.
natural.

Early
Normal Chum
|———|
11/27
Hoodsport
Hatchery

Late
Nrml. Chum
|———|
12/21
Skok. R.
natural

W. Stlhd.
|—|

Area 12D

Summer/Fall Chinook
|——————————|
7/24          9/8
Hoodsport Hatchery

Coho
|————|
10/24
12D natural

Early
Normal Chum
|———|
11/27
12D natural

W. Stlhd.
|—|
12/8

Stokomish R.

Spring Chinook
|——————————|
4/14          7/26 8/6
Skokomish River Natural

Summer/Fall Chinook
|—————|
9/19
George Adams/
McKernan
complex

Coho
|—|
Skok. R.
natural

Early
Normal Chum
|——|
11/7
George Adams/
McKernan
complex

Late
Normal Chum
|——|
11/30
Skok. R.
natural

W.
Stlhd.
|—|
1/4

Appendix Figure 1. Summary of the management regime in each management area of Hood Canal. The management unit controlling the harvest rate is given below the management period (continued).

Date

| Mgmt. Area | 5/1 | 6/1 | 7/1 | 8/1 | 9/1 | 10/1 | 11/1 | 12/1 | 1/1 |

Area 9A

Coho
9/18   Area 9A Pens

Early
Normal Chum
11/11   Little Boston Hatchery

W. Stlhd.
12/21

Area 12A

Spring Chinook
4/14   Quilcene National Fish Hatchery   6/29

Coho
9/1   Quilcene National Fish Hatchery   10/13   12A natural

Early
Normal Chum
11/19   Quilcene National Fish Hatchery

Late
Normal Chum

W. Stlhd.
12/21

Quilcene River

Spring Chinook
4/14   Quilcene National Fish Hatchery

Coho
8/31   Quilcene National Fish Hatchery

Early
N. Chum
11/9   12A natural

Late
N. Chum
11/25   Q.N.F.H.

W. Stlhd.
12/21